cases this morning. The first is No. 16-2520, Vinjan, Inc. v. Blue Coat Systems, Inc. Mr. Ormley. Thank you, Your Honor, and may it please the Court. Let me begin with the 844 patent. Claim one of the 844 is extremely simple. An inspector receives a file and links a security profile to it that identifies anything suspicious. The claim does not require a computer or software to make the identification or create the profile. It doesn't offer any particular way of figuring out what code is suspicious, much less a new way. And it doesn't require any particular way of linking, except maybe that the linking happens before a web server makes the file available. Could I ask you a question based on the specifications? It seems to me, and I don't think the parties addressed this in the brief, but it seems to me that this includes a security profile which is the result of applying a traditional virus scan to the downloadable. Is that correct? That's correct, Your Honor. There's absolutely nothing new about the security profile. The only claimed point of novelty is the idea that we attach it before the file is made available on the web server. And I think we think that's an abstract idea. Why is that abstract? You're attaching a file to a downloadable and providing that to an end user. Well, Your Honor, I can imagine that a specific system for generating or identifying or attaching that downloadable might be patentable subject matter, but that's not what they claim. What the claim covers is the concept of identifying suspicious files before you make them available on the web server. That's an abstract idea. More than a dozen of this Court's presidential opinions... But you can have any kind of a process, say a process of forming rails for a railroad where it's heating metal and extruding metal. You could say, well, that's an abstract idea, heating metal. Why is this any more abstract? Your Honor, I think the answer is if you claimed the idea of heating metal, this Court should not allow a patent. What you could claim, what you would be permitted to claim, is a specific implementation that is novel and inventive. But there is no such claim here. The claim is to the idea. Why isn't it novel and inventive that you generate a security profile and attach it to something before it's downloaded? Well, Your Honor, we don't believe that there's any sort of evidence to suggest that virus scanning didn't happen at the web server level. The argument wasn't... Let me ask you this. Is virus scanning an abstract idea? The concept itself, I think, might be an abstract idea. Absolutely. A particular implementation, a particular way of doing it might be patentable subject matter. This is the problem with step one of the Alice test. It encourages the focus on overly reductionist thinking because you can distill almost anything down to some abstract concept. I agree with that, Your Honor, but I think this case is not a particularly worrisome one for that question because this case is on all fours with intellectual ventures versus Symantec, with intellectual ventures versus Capital One, which I'm going to call Capital Two because there are actually two different intellectual ventures versus Capital One cases in this case. Those cases involve precisely the same idea and indeed close to the same invention. Well, not quite. I guess there are two things going on here which supposedly contribute to the novelty. One is that the virus scan, in my example, a traditional virus scan is done at an earlier point in time, but that was something that was well known before the patent application here was filed. But then the second part of it, which I think wasn't involved in intellectual ventures, is attaching the security profile to the downloadable. In other words, the results of the virus scan. Am I correct that that's what's being done here, that they're attaching the results of the virus scan to the downloadable? That's the idea, or at least some sort of a flag, a profile that says warning virus or identifies it doesn't have to be a virus, it could be some other file. I think that is the idea. Although, I guess if one were to do a virus scan at this web server and say there's a virus, it would be quite surprising to do anything other than alert people to the fact that there was a virus. If the inventive concept is just having done the scan at the server level, telling people about the results, I don't think that can satisfy step two. I think it's worth noting, when we come to the question of what is an inventive concept... But I don't think we're at step two in this case. This does not strike me as one of those typical software cases where you have some kind of business method or something done in the ordinary course of human conduct that is done faster or better or made possible by putting it on a computer. This is a problem endemic to computer security. It's a new way of doing it. It may not be particularly non-obvious because it's combining a bunch of different steps, but that's not where we are at 101. It is definitely an invention that relates to computers, but that's not what this court has said the test is. But I'm not saying it that broadly either. I'm with you. Most software patents that say do this on a computer are ineligible under Alice. But this is not do this on a computer. This is computers have specific problems with viruses, suspect files, all these kind of things. Here is a new way of solving security concerns specifically on a computer. This problem doesn't arise outside of the computer context. So why isn't this like NPHISH and DDR where it's improving computer functionality? Because there's no actual technological improvement to the computer functionality claim. So that is true, Your Honor, but the same... But I don't think you're right. There is a technological improvement and this is a new way of detecting viruses. We can argue about whether it's better or not, but it's certainly a different way of detecting computer viruses rather than having the virus scan done on your own computer. It's done before it gets to your computer. Well, I think, Your Honor, that there's nothing in the claims that identifies any new way of doing it. I thought it was well known to do virus scans before the downloadable and not to your computer at the time that this was filed. What's different here is attaching the results of that to the downloadable. I think that's right, Your Honor, and there's nothing claimed in Claim 1 that suggests that there's new method of virus scanning going on here. And that's why I think this case is like Intellectual Ventures v. Symantec where exactly the same issue, albeit in email v. web pages, was at issue. Identify the viruses and the potentially problematic emails first and flag them before they come to the computer. But the problem is that the difference here is that the results of the virus scan are attached to the downloadable. That's what's different. That's what's not well known. That's what's arguably novel, right? Your Honor, even if you accept that that is true, and I don't think it's necessarily true, but I don't think that they can claim under Section 101 to own the idea of scanning from a particular system. No, but that's not what I'm talking about. I'm saying it was well known to scan for viruses before it got to the user's computer. That seems to be the case. What's not well known is attaching the results of the virus scan to the downloadable. I would be surprised, Your Honor, if having done the scan in advance and found a virus, someone was not actually telling anyone about that. But I think that even if that were true, that is an idea. If that were true, why didn't you find some prior art that would anticipate or render it obvious? Well, Your Honor, it is the case that we argued prior art below and we did not appeal the prior art decisions here. I do think there's no reason to believe that this is new. But let me make another point. But there are a couple of things that are different here. It's not only scanning ahead of time and attaching the profile to the downloadable, but the fact that you're attaching something to a downloadable, which in and of itself has a little different profile. This is not just a file. It's a downloadable. So there's some programming that would run on a computer automatically. I don't think, Your Honor, that the claims require any such thing. All one need do... It does require attaching a profile to the downloadable. That's correct, Your Honor. And that it's attached to the downloadable before it's presented to a web user. Correct? That's right, Your Honor. And so if they put a label on it that says, warning possible virus, if they put a label on it that says, be careful opening files from the internet, under Fingen's theory, there is infringement. And I'd like to point out that Fingen's theory of what makes this patentable subject matter, which is precisely this idea of the attachment before they make it available, is not the way Blue Coat's system works. So Fingen has a problem either of patentable subject matter or of non-infringement. All of the arguments that they make for trying to suggest that this is patentable subject matter, they run away from when it comes to non-infringement. Because our system simply doesn't work in the way that you just described. You have a lot of issues here. We do. Unless I'm interrupting my colleague, can I move you on to either the 968 patent or damages? I want to hear from you on both. Certainly, Your Honor. So let me start with the 968 patent. The idea here is to prevent a cached file from automatically being whitelisted. Different policies might allow some kinds of files but not others to come into their system. So the idea of the patent is once your content is cached, we're going to have an index of whether you allow it, whether you allow it, whether you allow it, and so forth. Policies not on the index won't just automatically grab the file. They'll have to go back and run another scan. And the claim accordingly requires the index to store a set of decisions that result from determining whether a given digital content is allowable relative to a given policy. ProxySG doesn't work that way. ProxySG stores only individual condition evaluations. Does this file pass this particular check? Does it have this characteristic? Let me see if I can understand what the difference is here. As I understand it, what your client system does is that it stores the result of the application of particular rules, but it doesn't store the overall result of whether the content is acceptable. That's correct. So the question is whether that satisfies the claim language is saving the results as entries in the policy index, right? Serving results from determining whether a given digital content is allowable relative to a given policy. So the question is whether it's satisfied by storing the results of the application of a single rule or whether it has to store the results of whether the content is accessible to the user. The ultimate judgment versus individual questions, individual checks. And the district court at claim construction made clear that there's no dispute that our system doesn't store the final results. The district court said, I would grant summary judgment to Blue Coat, but I want to give Fingen the possibility of showing at trial that there are some policies out there where there's one and only one intermediate question. And if there's only one intermediate question, the intermediate question and the final result would be the same thing. But Fingen didn't show that at trial. They didn't even make any effort to show that at trial. Their theory is that storing the results of the application of a single rule is sufficient even though it's not storing the results of whether the content is acceptable or not. That would be the theory under which they might have been able to show infringement. That's why the district court let them get to trial on it. That's right. I think their theory is a little bit different from the district court's. My understanding is that what they say is that Blue Coat stores the result of the application of a particular rule to the content, and they say that it's not necessary under the claim to store the results of the overall assessment. Correct? That's correct, Your Honor, but that's not what the claim requires. Your Honor says there's a dispute. Well, except that it's not. There was a claim construction. They lost that claim construction. The district court said the claim does in fact require a final allowability determination. They did not appeal that decision. I don't think they can come here and now argue we want a new claim construction. They got to go to trial on this patent solely in order to try to prove that there are some circumstances where the intermediate and the final are the same thing because there's one and only one test, and they didn't prove that. How was the jury instructed on this? There was a claim construction which went beyond the language of the claim. Is that right? The claim construction involved the term policy index, which said that the term was a data structure indicating allowability of cached content relative to a plurality of policies. So what you're relying on is the notion that it has to store the allowability result and not just the application of a single rule. That's correct, Your Honor, and that is the thing that was supposedly new about the invention. Let me say a few words about damages, and let me here highlight two. Just to be clear, I wanted to hear about the 844. 844 damages, certainly, Your Honor. So Finjen offered no expert testimony at all on the jury to award $24 million based on all worldwide users. It did engage in an analysis that parsed to the smallest saleable unit, DRTR. It said, DRTR is 4% of sales, so let's do 4%. But it did not take the next required step and a portion between the infringing and the non-infringing portions of DRTR. There is no effort to a portion between the infringing and the non-infringing portions of DRTR. DRTR has 86 different functions in that cookie 2 file. Maybe they accuse one of them, maybe they accuse four of them. They certainly don't accuse all 86. And DRTR also does lots of other things besides parsing suspicious categories, as Finjen's own expert agreed at a $399.85. When there is a smallest saleable unit, but that smallest saleable unit has both infringing and non-infringing portions, apportionment is the most important part of the DRTR function? It might be, Your Honor. We don't know. We don't know because they presented no evidence on that question. But even if it were the most important, it can't be all of it. They do not make either in the district court or on appeal an entire market value rule argument. They don't argue that this is the only reason people bought this. And so we think at a minimum, remand is required for a new trial on the damages question, because as Vernetik said, where the smallest saleable unit is in fact a multi-component product containing several non-infringing features, the patentee must do more to estimate what portion of the value of that product is attributable to the patentable technology. Here they did nothing. And I think that requires a new trial on damages. If I may make one final point on damages, I am over time. The other thing that's quite remarkable is that at closing argument on the other three patents that are at issue, counsel expressly asked the jury to double their own expert's number, and the jury did exactly that. So for the other three patents, the counsel said that's the floor. Reasonable royalty is the floor. Based on the facts, it can be higher than that. He asked you to double the number. The jury did double the number. We submit that that is flat-out reversible error. Here we think a remitted or at least to no more than half of the damages for those patents is appropriate. Okay. Unless there are further questions, I think we're out of time. We'll give you two minutes for rebuttal. Thank you, Your Honor. Mr. Andre? Good morning, Your Honors. May it please the Court? On the one-on-one issue, could I see what extent there's common ground here? If I understand the claim correctly, it would cover the application of a traditional virus scan, right? That could be part of the security profile. It could be, but what Finjen invented... I'll take this one step at a time. Okay, so a traditional virus scan only scans for known viruses. Yes, it could be part of the security profile. It's generally not. I'd say no, it's not. It's not? No. But there's reference in the specification to traditional virus scans. Traditional virus scanning was a known signature. Don't misunderstand me. I'm not saying that this is limited to simply doing a traditional virus scan. I'm not saying that. Don't get concerned about that. I'm just saying that the security profile could be the result of a traditional virus scan. Hypothetically, it could. Okay, alright, so then it was well-known, wasn't it, to do a virus scan before it got to the user's computer? There was no prior art that was submitted at trial that we saw that did that. Because traditional virus scanning was of known viruses, and known viruses had to be attached to a host file. And that host file would then go down to the user's computer, and they would scan it at the user computer. Okay, so you don't agree that it was well-known to scan before No. I think the location of the scan was a novel idea. And the type of scan that was done there was also very novel. Let's assume that we would disagree with you on that, and find that scanning before it got to the user's computer was a well-known feature. So then that would leave the idea of attaching the results of that virus scan to the downloadable. And could you address whether that's an abstract idea or not? No, it's not. This is a unconventional solution to a new technical problem. And that's what this patent comes down to. The idea of one, scanning at an intermediary computer was new. Because back in the day, back in 1996, we didn't have the computing power we have today. So that was new into itself. But then attaching a new file that was generated, a brand new file that was non-creation to that downloadable, and then sending it on, that would take it way outside the bounds of the abstract idea. This is a, the security profile generation is something that was never done in the prior arc. It just, it was not done. At an intermediary computer. So the idea that this claim tells you how to actually do this process is key. It's just like... Well, that sounds like the second step of Alice, right? Well, it's also, I think it goes towards EnFish as well, that it's also part of the first step. The idea of receiving by an inspector a downloadable, as Judge Lynn talked about, downloadable had a very specific meaning. It's a capital D downloadable. It was defined. And it's defined as an executable application program which is downloaded from a source computer and run on a desk station computer. That's new to the internet at that same time. Because that was just not done either. There was not automatic programs that came in, executable programs that came in and started running. That was an advent or a result of the Java computer programming language. It was introduced in late 1995. So that new problems that resulted from Java and the solutions that this invention talks about makes it very, very different. So from the very first step you know that it's rooted in computer technology with the definition of downloadable. Very first claim element. The second claim element generating by the inspector at this intermediary a security profile is something that was never done either. That takes us outside of the abstract realm as well. Because the security profile identifies suspicious code. If it was a traditional virus scan that would be known, that would be a virus. This is supposed to identify code that no one's ever seen before. Brand new malware that was introduced has never been seen. Well, no, but that's not true. I mean, you agreed that it could be scanning for traditional, using a traditional virus scan. It can, but that's the reason I kind of qualified my answer. The idea here is to identify suspicious code. Code that you've never seen before. Now traditional virus scanning could only identify known viruses. This was, the purpose of these inventions... This includes scanning for known viruses. You agreed to that earlier. I said it could include that type of scanning, but also it scans for... The fact that it also does something else isn't exactly relevant to the question of whether the broader concept is abstract. If you had a narrower claim, which said this does not extend to traditional virus scanning and includes checking the downloadable for certain other features, that would be a narrower claim in a quite different situation. But what we have is a situation in which you've chosen to write a claim, which is broad enough to be sure. You say you do two things differently about that. One, that you do it earlier, before it gets to the user computer. And second, that the results of the scan are attached to the downloadable. The question is whether those two features take it out of the realm of the abstract. As to the first of those, that is the location of the scan, seems to be somewhat difficult to understand that scope, right? Intellectual Ventures was just doing purely an email filter. And that was just filtering emails as it came through, just based on... Yeah, but the location said to be what was novel about was the location of the scan, right? Here, it's not only the location it's also generating the profile at that location. That's attached to the downloadable. I want to be very clear, traditional signature scanning, that's how it was done before our inventions. Our inventions do not do traditional signature scanning. They could capture traditional viruses by looking for suspicious operations, like the eval functions, doc writes, various other functions in computer science. It could do that. So it could catch traditional known viruses. But the purpose of these inventions is to identify unknown viruses. That's the key. You keep saying that, and yet the claim's not limited to that. So I don't understand where that gets you. It captures known and unknown. Before this invention, there was no method to capture unknown viruses. It would be infringed if you had a security profile that only captured known viruses, right? But the security profile itself is just a profile of the downloadable. So if your security profile... But if the security profile would be reflected the application of a known virus scan to the downloadable. I'm not sure I understand that question. If a known virus came into the infringing systems... If the infringing system had an approach of scanning for known viruses using traditional virus screens, and then that was done before it got to the user's computer, and the results of that scan were attached to the downloadable, this would be infringed, right? I think... I don't know if that would be the case. I think because what we're talking about here is generating by the inspector a security profile that identifies suspicious code. If a known virus comes into the system and it identifies a suspicious code, it would be infringed, yes. So a traditional virus scanning is a little bit mixing... We're mixing apples and oranges a little bit on the technology. But let me go back to the 101 context because whether they infringe or not is something that is, you know, we had a very substantial record below. I'm not addressing it. I'm saying for 101 purposes, you have to be able to defend an application of this which would be an infringement. And we have to look at the scope of the claim in order to determine the 101 question. So what we think for the 101, we think there are each of the three elements takes outside the 101 analysis. One is the fact you're receiving by the inspector a downloadable, which puts you in the computer realm, obviously, generated by the inspector, this downloadable security profile, which was a new way of solving and told you how to solve this new problem. And then linking is an important element. That's a very important element to take outside the abstract as well. Linking the profile from the downloadable. Absolutely. And so in each one of those three, I think, take it outside of the abstract. And if you get to the step two, which you should not get to, but if you did, you'd also say this is inventive concept. There's a reason that there was absolutely no prior art talking about this. This was a brand new way of doing something. This was a very, it could not be thought of to do an analysis like this because it just doesn't, it's unconventional to say the least. So I would like to remain time. I do want to talk about some of the other questions. I don't know if Judge Hughes, you had some questions about damages? Perhaps you could address quickly the 968 patent and the damages. On the 968, this was an issue that was fought out over claim construction. You heard the court's claim construction here. Is my characterization of the difference between the parties correct? Yes. And what the jury heard was factual evidence, very substantial evidence and the judge who actually gave the language in the claim construction, she had a very fully developed record down below. She had her claim construction, summary judgment, she had a two week trial and a bench trial thereafter. We have a very strong record here that they ignore completely. They're trying to go back and revisit claim construction and make the claim language say something it doesn't. This is an instance where... But doesn't the jury instruction which is, expands on the claim language based on the claim construction, doesn't it seem to require that the results of the review be cached as well as the results of the application of a particular rule? That's not how we saw it and it's not how the judge saw it in her claim construction. I think we had substantial evidence to show as the district court judge said and she, like I said, she lived with these patents for three years. There was substantial evidence to show that they infringed based on the record below of storing in the cash what they stored. The final decision did not have to be stored per se. We gave that in chapter and verse and jury had a factual inquiry. They're trying to redo claim construction here today but at the time there was no dispute on the claim construction. It was just the application of the facts to that claim construction that was in dispute. The jury had a strong factual record. So in that regard... Maybe you should address the 844 damages, both the apportionment question and the $8 royalty claim. Sure. On the apportionment the thing that my friends keep ignoring here is that whenever a file gets to the DRTR, you get a DRTR response every single time. And a DRTR response is a security profile we're talking about. There's no question about that but it does more than that. What's that? It does more than that. The DRTR is not... It's performing a function which isn't covered by the patent. Which is, as I understand this sort of categorization as to what type of downloadable it is. What we're saying is every single time... Help me. Am I correct that it's performing a function other than the patented function at the same time that it performs the patented function? It's inclusive with other functions, yes. So why shouldn't there be an apportionment between the patented function and the other function? Because there was a massive apportionment already. The apportionment that happened already is a different kind of apportionment between how much traffic there was and how many requests there are, which is the 4%, right? DRTR is not the smallest sellable unit. Let's take one step back from that. That is the footprint of the invention. That's the smallest aspect of the footprint of the invention. What the jury found, what the judge found, was that every time a file comes into the DRTR, there's a DRTR response which is an infringing step. That's the infringing aspect. Every single time that is implicated, you get a DRTR response 100% of the time. It never doesn't get a DRTR response. It never does not infringe. I don't think anybody is contesting that with respect to the damages issue. It certainly does perform an infringing function. It also performs a non-infringing function and the question is whether there should be apportionment between those two. What you would call the non-infringing function is not a separate function. They're inclusive into the DRTR response. The DRTR response is inclusive. You can't parse those out. There's no way you can parse that out in any logical way. Because every single time a file comes into the DRTR, you get a DRTR response. In the response, there will be some of the infringement and some not infringing information. Well, that would mean that any time something performed an infringing and a non-infringing function, there wouldn't be any apportionment. No, if you have part of the DRTR itself not performing the function. There's no part of the DRTR that does not perform a non-infringing function. How about the $8? Well, $8 was uncontested. Uncontested? It was undisputed. They didn't cross-examine. They did not put their own witnesses up on damages. But that doesn't mean it's uncontested. Well, it was undisputed at trial. The witness got up on the stand. They agreed that $8 was the right royalty? No, they didn't cross-examine. So what? The jury had no other evidence. The question is whether you have the burden of proof. The question is whether you put on enough evidence. They don't lose their right to challenge the $8 figure because they didn't cross-examine your expert. And didn't put any other evidence for the jury to consider. So I say it's undisputed. But it doesn't matter. If your evidence is totally insufficient as a matter of law, the fact that they didn't cross-examine it doesn't somehow transform it into credible evidence. Why is the $8 credible evidence? Because as the district court found, as the jury found, the $8 is based on 8 and 16% royalty rate that was determined at the time of the hypothetical negotiation in 2008 by this court when they affirmed those numbers. So the 8 and 16% royalty rate was applied. In a case that involved other patents as well, right? Yeah, it had some overlap patents and some other related patents. But they didn't approve an $8 rate. Well, they approved the 8 and 16% rate. And so Finch had been using that 8 and 16% royalty rate since 2008 at the time of the hypothetical negotiation. How does that relate to $8? So then there's two methodologies you use. You look at the industry average of price of software and you apply 8 and 16% to it, or 16% in this case, and get you to $8. So our witness got up and said, since 2008, Finch has been using an $8 per user fee or 8 and 16% royalty rate. That's the starting point for negotiation? That's the starting point for negotiation. Well, what does the fact that they use it for the starting point for negotiations say about whether that's a reasonable royalty? The question is not whether that's a starting point. The question is not whether your client seeks at the beginning of a negotiation to get an $8 rate. The question is whether at the end of the negotiation they've agreed to an $8 rate. And you don't have any evidence of agreement to an $8 rate for a similar patent, do you? We have the 8 and 16%. We do. So that's what the evidence was put in. This is the evidence we use as our negotiation point. So it is a starting point, and that was a position we took at the trial, that it was based on a Federal Circuit affirmation of the rate applied to the facts of the case at the time of the hypothetical negotiation. So that's the evidence the jury heard for the $8. And there was sufficient backup for that. It wasn't just pulled out thin air. It was based on the 8 and 16%. So your argument is that even though that was just proposed as a starting point, there was some reasonable basis for it? Yes. And that was the only evidence the jury received on the rate. There was no counter evidence at all to say that was unreasonable. Now, it was based on factual basis for coming up with that number, and there was nothing to counter it. So, you know, that's what we do at jury trials. They decide the facts. And the facts in this case were that was a starting point. That's what we would agree to. $8 was what Finch and wanted. What they would agree to or license at the time of the hypothetical negotiations. Yeah, but was there any evidence that the accused infringer or the person seeking a license would agree to that rate? There was. There's OEM licenses that were higher. OEM agreements. Those were software licenses. They were software licenses, but it was a per user base license, once again, with Finch and when they were partners when they were OEMing our software, it was $14 to $16 per user. So the jury had that to look at saying, well, when they were OEMing our technology and said license our patent, they were much higher than $8. So there was evidence in the record to show that a per user basis was... Which of our cases has said that you look to a software license to determine what the patent royalty should be? If it's a comparable license, I don't think you can say a product license and a patent license are necessarily comparable one for one. I don't think I could cite you a case that says that. But there is a way you're looking at how they did business in 2008. When people wanted to acquire someone else's technology, in this case it was OEMing technology, they paid a per user base. Okay. Unless there are further questions, I think we're out of time. Thank you, Mr. Conrad. Mr. Lemley, you have two minutes here. Thank you, Your Honor. Let me just begin with the damages point. It is absolutely the case that DRTR does other things besides infringing. That is Finch's own expert in the field. Even beyond the 4%. That alone is the sufficient grounds for reversal in the damages. On the 8% number, there was no expert witness who testified on the 844 patent. The $8. Right. The $8 number is what he told the jury in closing argument. What the witness said was 8% to 16%, not $8, is what we would like to get for our entire patent portfolio. Not for this patent, but for all the patents, including the others at issue here, including ones that were found not infringed here, and including ones they didn't even assert here. And that's A40409. So I think the damages award on the 844, at a minimum, has got to be reversed. It's hopeless. But I think you need not get to the damages question on the 844. Even if this Court doesn't believe that the invention is invalid under Section 101, if it's not invalid under Section 101, it has to be because of these features that are present in the claims. They are imported from the specification. But if we are going to read them as requirements to make it patentable subject matter, our system doesn't work that way. We do not, in fact, identify and attach profiles before you make a file downloadable available on a web server. We simply don't. We intercept them after it's made available on the web server, at an intermediary stage, and we assess them then. The District Court specifically found that our network gateway could not be a web server for purposes of the claims in claim construction. So if you believe that this is patentable subject matter because it attaches a file to a downloadable before it's made available on the web server, there is no infringement of the 844 patent in this case. Thank you, Your Honor. Okay. Thank you, Mr. Lonely. I thank both counsel. The case is submitted.